BARNES, J„
for the Court:
¶ 1. Brian E. Wikel appeals the denial of his motion for modification of child custody by the Oktibbeha County Chancery Court. Finding no error, we affirm.
SUMMARY OF FACTS AND PROCEDURAL HISTORY
¶ 2. Brian Wikel and Bethany Wikel Miller were divorced on January 7, 2005. The couple share joint legal custody of their two minor children — Zachary, born on September 1, 1998, and Garrett, born on February 26, 2001. Primary physical custody was awarded to Bethany, subject to Brian’s specified visitation rights. The property settlement provided that Brian would have alternating weekend visitation and one night of midweek overnight visitation. At the time of the divorce, both parents were living in Starkville, Mississippi, with Brian living in the former marital home. Bethany subsequently moved to West Point, Mississippi, where she taught high school. Brian worked at a nearby Sara Lee® factory in West Point. However, when the West Point factory closed down, Brian moved to Florence, Alabama, in May 2007, to continue his employment with Sara Lee®. Bethany and her current husband, Will Miller (Will), now live in Nesbit, Mississippi, where she works as a counselor at a nearby correctional facility.
113. Shortly after the divorce, the children began experiencing emotional and behavioral problems. Zachary was exhibiting angry outbursts and becoming physically aggressive with his younger brother, who was very repressed with his emotions. Concerned about this behavior, Bethany took the boys to a counselor, Melanie Benson. Ms. Benson counseled Zachary and Garrett from March 2005 to July 2007, during which time she met with them on approximately twenty-two occasions. In her initial assessment, Ms. Benson diagnosed Zachary with adjustment disorder, with mixed anxiety and depressed mood. She identified the stressors as being the parent’s divorce, difficulty with the visitation schedules, and tension between his parents. Since Zachary’s problems were affecting Garrett, Ms. Benson also had Garrett participate in counseling and diagnosed him with adjustment disorder, unspecified.
¶ 4. Although Bethany did not consult Brian upon initiating the counseling, Brian later participated in several counseling sessions. During their therapy, the children mentioned their mother’s male friends on a couple of occasions. In the summer of 2006, Brian related his concern regarding Bethany’s bringing men to the house as he felt that this behavior confused the children. Ms. Benson advised Bethany to limit the children’s contact with any of her romantic partners. Ms. Benson’s advice was based upon the fear that the children might form attachments to the male figures, which could lead to abandonment issues if the relationships did not work out. However, Bethany told Brian *32 not to interfere in her personal business, and she did not appear to follow Ms. Benson’s suggestions. In two subsequent sessions, Brian and Bethany specifically discussed incidents where her boyfriend, Will, had spent the night in the home while the children were present.
¶5. On August 24, 2006, Brian filed a complaint for modification of the final judgment of divorce. Specifically, he requested modification of the primary physical custody of the children from Bethany to Brian, citing a substantial change in circumstances, namely, Bethany’s inappropriate and immoral behavior. He further claimed that Bethany’s refusal to communicate with him and allow him to participate in his sons’ activities was adversely impacting the children. Alternatively, Brian requested that the chancellor modify the existing visitation schedule to provide more extended visitation periods. Bethany, who married Will a few days after Brian filed his complaint, filed an answer and a counter-claim for modification on October 26, 2006. In it, she denied Brian’s allegations and sought an increase in child support, the right to claim an income tax deduction on both children, and a modification of the visitation schedule. She also sought sole legal and physical custody of the children. On November 13, 2006, Brian filed an answer denying Bethany’s requested relief and a motion to amend his complaint for modification.
¶ 6. A trial was held on September 8, 2008, and October 29, 2008, on the motions. In her testimony, Bethany admitted to the court that, while she was still married to Brian, she had engaged in sexual intercourse with a minor student, eleven years her junior, at the high school where she was employed as a teacher.[1] She further admitted that she had let her boyfriend, Will, who was now her husband, spend the night on a couple of occasions while the children were present in the home. However, in its opinion and judgment entered on December 3, 2008, the chancery court denied Brian’s motion for modification, finding that the children were doing well in school; the children’s emotional problems were primarily a result of the divorce transition; and Bethany had been remarried for two years. The chancellor also denied Bethany’s request for an increase in child support. However, due to the relocation of both Bethany and Brian, the chancellor did modify the existing visitation schedule.
¶ 7. On December 10, 2008, Brian filed a motion for reconsideration of the custody issue or, in the alternative, to revise the specified visitation periods. On December 12, 2008, Bethany filed a motion to reconsider the request for modification of child support. The chancellor, in an order filed on December 22, 2008, overruled Bethany’s motion and partially overruled Brian’s motion as to the issue of modification of child support. The chancellor granted Brian’s motion in regard to an amendment to Brian’s visitation schedule. On January 15, 2009, Brian filed a notice of appeal regarding the modification of child custody.[2]
Whether the chancellor’s denial of the modification of child custody was manifestly wrong and/or clearly erroneous.
¶ 8. This Court’s standard of review in cases involving child custody is limited. Connelly v. Lammey, 982 So.2d 997, 999 (¶ 2) (Miss.Ct.App.2008). “[I]n order to reverse the chancellor’s findings, the chancellor must be manifestly wrong, *33 clearly erroneous, or have applied an erroneous legal standard.” Id. (citing Hensarling v. Hensarling, 824 So.2d 583, 586 (¶ 7) (Miss.2002)). Therefore, a chancellor’s findings of fact “may only be disturbed if they are not supported by substantial, credible evidence.” Ellis v. Ellis, 952 So.2d 982, 989 (¶ 15) (Miss.Ct.App.2006) (citing Johnson v. Gray, 859 So.2d 1006, 1012 (¶ 32) (Miss.2003)). However, we review issues of law de novo. Balius v. Gaines, 958 So.2d 213, 218 (¶ 8) (Miss.Ct.App.2005) (citation omitted).
i. Material Change of Circumstances
¶ 9. Brian argues that the children’s emotional problems, their exposure to Bethany’s boyfriends, and Bethany’s reluctance to communicate with Brian warrant a change in primary physical custody. Further, he notes that it was stipulated at trial that Brian is a good father who has a great relationship with his children. In order to obtain a modification of child custody, the non-custodial parent must prove: “(1) that a material change of circumstances has occurred in the custodial home since the most recent custody decree, (2) that the change adversely affects the child, and (3) that modification is in the best interest of the child.” Powell v. Powell, 976 So.2d 358, 361 (¶ 11) (Miss.Ct.App.2008) (citing Giannaris v. Giannaris, 960 So.2d 462, 467-68 (¶ 10) (Miss.2007)).
¶ 10. In determining whether a material change in circumstances has occurred, we must look at the “totality of the circumstances.” Minter v. Minter, 29 So.3d 840, 847 (¶ 26) (Miss.CtApp.2009) (citing Mabus v. Mabus, 847 So.2d 815, 818 (¶ 8) (Miss.2003)). This Court has stated that:
While numerous factors may go into the initial consideration of a custody award, ... only parental behavior that poses a clear danger to the child’s mental or emotional health can justify a custody change. It is only that behavior of a parent which clearly posits or causes danger to the mental and emotional well-being of a child (whether such behavior is immoral or not), which is sufficient basis to seriously consider the drastic legal action of changing custody.
Lambert v. Lambert, 872 So.2d 679, 684 (¶ 22) (Miss.Ct.App.2003) (internal citations and quotations omitted). However, “[t]he ultimate consideration in matters of child custody is the best interest of the child.” McCraw v. Buchanan, 10 So.3d 979, 984 (¶ 18) (Miss.Ct.App.2009).
¶ 11. To support his claim that custody should be modified, Brian points to instances of Bethany’s immoral conduct such as her sexual encounter with a high-school student and the presence of male friends in her home with the children present. Since Bethany’s incident of sexual misconduct with a high-school student was not known to Brian prior to the divorce proceedings, the chancellor did take the matter into consideration when examining the issue of custody modification. See Powell, 976 So.2d at 363 (¶ 22) (a court may sometimes consider pre-divorce circumstances in order to “[t]o determine whether a change of circumstances has occurred since the original decree”). Bethany admitted at trial that she knew that the misconduct was “wrong,” which, she explained, is why it only happened once. The record further shows that Bethany dated two men after her divorce — Will and Cain Cannon. She testified that she only dated Cain for a couple of weeks and that he only spent the evening at the house when the boys were not home. However, Bethany did admit that she allowed her (then) boyfriend, Will, to spend the night at her home while the children were present. Bethany and Will further testified that they had sexual relations on one occa *34 sion while the children were home; however, Bethany noted that the children were asleep.
¶ 12. “[Any] resolution of factual disputes is always a matter entrusted to the sound discretion of the chancellor.” Minter, 29 So.3d at 850 (¶ 36) (citing Carter v. Carter, 735 So.2d 1109, 1114 (¶ 19) (Miss.Ct.App.1999)). Due to a chancellor’s actual presence in the courtroom, he is “best equipped to listen to the witnesses, observe their demeanor, and determine their credibility.” Id. Here, the chancellor had the discretion to determine the weight of certain evidence, especially when considering Ms. Benson’s testimony versus the content of her patient records. Further, the chancellor had the discretion to consider that, at the time of the hearing, Bethany had been married for two years; therefore, he found that any poor judgment on Bethany’s part was less likely to occur in the future. Nothing in the record shows that Bethany’s rare lapses of judgment caused any emotional harm to her children. Although the boys told Ms. Benson about the presence of Bethany’s male friends, Brian and Ms. Benson were significantly more upset about this fact than the children. Brian complains that Bethany failed to cooperate with Ms. Benson’s recommendation to limit the children’s exposure to her male friends. This Court acknowledges that there was one instance where Garrett, the youngest child, stated that he did not think that it was morally wrong for an unmarried couple to spend the night together. As Garrett further explained to Ms. Benson, he and Zachary were not “married” and they spend the night together. This response showed that the children were not capable of understanding sexual issues. Also, Ms. Benson’s notes never demonstrated that the boys expressed any displeasure or negative feelings regarding the issue of Will staying overnight at the home.
¶ 13. Brian also asserts that Bethany failed to keep him informed about the welfare and activities of the children, especially as it pertained to school and counseling. There is no dispute that Bethany retained the counselor, Ms. Benson, without consulting Brian. Further, she changed counselors two years later when she felt that the boys were not progressing. However, Bethany was proactive in obtaining counseling for the boys upon a showing of behavioral problems immediately following the divorce, and her actions promoted the children’s best interests. While we agree that Brian should have been informed in a more prompt fashion, once so informed, Brian was permitted to participate in the counseling, which he did on occasion. In regard to school activities and grades, Brian has the right to obtain any of the children’s school records and information, and the record reflects that he has taken full advantage of this right. Thus, we find nothing in the record to show that this argument warrants a change in custody.
ii. Adverse Effect on the Children
¶ 14. Brian also contends that the children’s need for counseling is an indication that a modification of custody is warranted. He claims that Ms. Benson testified that the children’s emotional problems were causally related to Bethany’s actions with overnight male friends and her refusal to communicate with Brian. However, the testimony to which Brian refers is merely an opinion by Ms. Benson that the boys, especially Zachary, felt some “pressure” not to discuss Will in front of their father and that this pressure added to the children’s stress. The record clearly shows that the majority of the children’s emotional problems were a result of the divorce, namely the transition of going *35 back and forth between Bethany’s and Brian’s homes, and Zachary’s distress that his father did not spend more quality time with them during visitation. In her testimony, Ms. Benson stated:
I think one of the main things was that [Zachary] seemed to be very angry, that he was causing difficulty between himself and his brother, Garrett, maybe behaviorally, and also with some aggression toward his brother. You know, the physical is what I think concerned her, because it was — the divorce, that was one thing that I concluded that it may be related to as far as that being one of the primary stressors, that there had been parental separation and divorce and the visitation schedule.
(Emphasis added). The counseling records do not reflect any negative feedback regarding their home life with Bethany or the presence of her two boyfriends after divorce, and the boys seemed to get along with Will. In fact, Ms. Benson’s notes from June 9, 2005, state that both boys “seem very pleased with interaction with Mother’s boyfriend.” She also testified at the hearing: “I think that there is a positive bond with [Bethany]. It is apparent and obvious with the children’s affection that they love her and that she loves them. They have a good disposition with Mr. Miller.” Will also testified that he was responsible for getting the boys to and from school every day.
¶ 15. Brian also claims that Bethany refused to cooperate with him on visitation and that this had an adverse effect on the children. Admittedly, “[[Interference with the exercise of custody can constitute a material change in circumstances.” White v. White, 26 So.3d 342, 349 (¶ 21) (Miss.2010). We observe that the record is replete with issues over visitation and must agree that this tension between the parents over visitation contributed to the boys’ emotional issues. However, many of the incidents were either minor disagreements on where to meet or involved Brian’s wanting the children outside of the visitation schedule. At the hearing, Ms. Benson testified that:
[T]here were instances when there would be a recommendation made that I perceived that Mrs. Miller may not want to cooperate specifically with Mr. Wikel on that matter, not that she wanted to intentionally cause harm to the children, that there was a lack of cooperation sometimes with visitation and everything was so rigid, that it made it hard to alleviate some of the pressure from the boys regarding visitation.
(Emphasis added). Furthermore, Bethany testified there had been occasions where Brian harassed her over visitation and was verbally abusive, which, she explained, was why she had failed to communicate effectively with him. As the chancellor capably addressed this issue with the imposition of a comprehensive visitation schedule, we find this issue does not warrant a reversal of the chancellor’s holding.
¶ 16. Lastly, Brian complains of an incident where five-year-old Garrett was permitted to shoot a loaded gun, with only Will’s seventeen-year-old brother for supervision. We agree that the hunting incident is, indeed, disconcerting and an extremely poor exercise of judgment on Bethany’s part.[3] However, this was a single incident, and Bethany testified that she and Will were present on the hunting trip and located nearby. Therefore, while *36 we would strongly advise Bethany against this type of lapse in judgment in the future, we do not find that this single incident requires a modification of the custody agreement.
¶ 17. The chancellor observed that both boys were doing well in school and were physically healthy. At the time of the hearing, Bethany and Will had been married for approximately two years and had moved the children to a new home near Olive Branch, Mississippi. Will and Bethany’s mother also testified that the boys were thriving in their new school and had established a good routine, such as playing in the park across the street from the house after school and then doing homework before dinner. Accordingly, based upon the totality of the circumstances, we cannot find that the chancery court erred in determining that no material change in circumstances had occurred resulting in an adverse effect on the children.
iii. Best Interests of the Children
¶ 18. We find no error in the chancellor’s failure to set forth any findings with respect to the :Albright[4] factors as he found no material change in circumstances. See In re E.C.P. v. C.A.P.R., 918 So.2d 809, 825 (¶ 69) (Miss.Ct.App.2005) (“[w]hen considering a modification of child custody, the proper approach is to first identify the specific change in circumstances, and then analyze and apply the Albright factors in light of that change.”) (citing Thornell v. Thornell, 860 So.2d 1241, 1243 (¶ 6) (Miss.Ct.App.2003)).
CONCLUSION
¶ 19. “This Court gives great deference to a chancellor’s findings of fact.” Webb v. Drewrey, 4 So.3d 1078, 1081 (¶ 11) (Miss.Ct.App.2009) (citing Buford v. Lo-gue, 832 So.2d 594, 600 (¶ 14) (Miss.Ct.App.2002)). Furthermore, even if this court would have made different findings, we “will not substitute [our] judgment for that of the chancellor[.]” Carlson v. Matthews, 966 So.2d 1258, 1260 (¶ 6) (Miss.Ct.App.2007) (quoting Owen v. Owen, 798 So.2d 394, 397-98 (¶ 10) (Miss.2001)). Finding no error in the chancery court’s holding that no material change of circumstances existed to warrant a modification in custody, we affirm.
¶ 20. THE JUDGMENT OF THE CHANCERY COURT OF OKTIBBEHA COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., MYERS, P.J., IRVING, GRIFFIS, ROBERTS AND MAXWELL, JJ., CONCUR. CARLTON, J. DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY LEE, P.J., AND ISHEE, J.

. No criminal charges were brought against Bethany as a result of this single incident.

. Bethany filed a cross-notice of appeal on January 29, 2009. However, Bethany's brief addressed no additional claim other than the one raised by Brian.

. We also observe that this constituted a misdemeanor pursuant to Mississippi Code Annotated section 49-7-20.1(2) (Supp.2009), which states that “[a] child under the age of twelve (12) must be in the presence and under the direct supervision of a licensed or exempt hunter at least twenty-one (21) years of age when the child is hunting.”

. Albright v. Albright, 437 So.2d 1003 (Miss.1983).